UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAWRENCE JACKSON,

        Petitioner,

                                   CASE NO. 4:13-CV-10724
  v.                                JUDGE TERRENCE G. BERG
                                    MAGISTRATE JUDGE PAUL J. KOMIVES

RANDALL HAAS,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.   *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.   *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.   *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    D.   *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    E.   *Ineffective Assistance of Counsel (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
             a. Cross-Examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
             b. Suppression of Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
             c. Failure to Object and Request Investigator . . . . . . . . . . . . . . . . . . . . . . . . 20
    F.   *Limitation on Cross Examination (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    G.   *Sentencing (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        1.    *Guidelines Scoring* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        2.    *Judicial Factfinding* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        3.    *Proportionality* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    H.   *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . 33
        1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    I.   *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner Lawrence Jackson is a state prisoner, currently confined at the G. Robert Cotton Correctional Facility in Jackson, Michigan.

        2.      On April 22, 2010, petitioner was convicted of two counts of armed robbery, MICH. COMP. LAWS § 750.529; receiving or concealing stolen property, MICH. COMP. LAWS § 750.535(4); felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a bench trial in the Wayne County Circuit Court.  On May 11, 2010, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to concurrent terms of 20-35 years' imprisonment on each robbery conviction, one year imprisonment on the stolen property conviction, and 2-5 years' imprisonment on the felon in possession conviction, all consecutive to a mandatory term of two years' imprisonment on the felony-firearm conviction.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

        I.      MR. JACKSON ASSERTS THERE WAS INSUFFICIENT EVIDENCE UPON WHICH TO CONVICT HIM OF ROBBERY ARMED AND THE OTHER CHARGES; HIS CONVICTION SHOULD BE REVERSED.

        II.     MR. JACKSON ASSERTS HIS SIXTH AMENDMENT CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED BY COUNSEL'S ACTIONS.

        III.    THE SENTENCE WAS BASED UPON INACCURATE INFORMATION AND WAS DISPROPORTIONATE TO THE SERIOUSNESS OF THE

2

OFFENSE AND THE DANGEROUSNESS OF THE OFFENDER.

IV. DUE PROCESS REQUIRES RESENTENCING WHERE THE COURT ENHANCED MR. JACKSON'S SENTENCE BASED ON FACTS NEITHER ADMITTED BY MR. JACKSON NOR PROVEN TO A JURY BEYOND A REASONABLE DOUBT.  US CONST AM VI, XIV.

The court of appeals found no merit to petitioner's claims, and affirmed his convictions and sentences.  *See People v. Jackson*, No. 298420, 2011 WL 3209205 (Mich. Ct. App. July 28, 2011) (per curiam).

4.     Petitioner sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Jackson*, 490 Mich. 973, 806 N.W.2d 324 (2011).

5.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on February 20, 2013.  As grounds for the writ of habeas corpus, he raises the claims raised in the state courts (condensed into three claims).[1]

6.     Respondent filed his answer on September 13, 2013.  He contends that portions of petitioner's second and third claims are unexhausted, and that all of petitioner's claims are without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

The facts underlying petitioner's convictions were accurately summarized by the Michigan Court of Appeals:

Defendant's convictions arise from the robbery of Andre Hampton and Andrew Williams outside a house where the two men were installing a door.  The evidence indicated that defendant was accompanied by one other man, while a third

---

[1]Petitioner's form application contains a brief statement of his claims, but petitioner has not filed a brief in support of his petition.  In analyzing petitioner's claims, therefore, I rely in large part on the brief filed by counsel in the Michigan Court of Appeals.

3

acted as a lookout, but only defendant pointed a firearm at the complainants and demanded their belongings. After the robbery, Hampton followed defendant to a house, the police were summoned, and they brought out four men from that residence. Hampton and Williams both identified defendant as the person who robbed them at gunpoint. The defense theory at trial was that the complainants' identifications were inconsistent and not credible.

*Jackson*, 2011 WL 3209205, at *1. The evidence adduced at trial was more fully summarized in

petitioner's brief to the court of appeals:

> The chief complainant, Andrew Hampton (38 years of age), testified that on November 1, 2009 he and his cousin Andrew Williams were hanging a side door at a residence at 19373 Mansfield in the City of Detroit. It was about 7:30 pm and fairly dark outside. Mr. Hampton stated there was a 75 watt side door outside light. Also the front door light was on and there was a drop light and hall light although they were inside. Mr. Williams (the cousin) was working inside and the side door was closed. Mr. Hampton testified the main perpetrator, whom he identified as Mr. Jackson, and a second person, whom he identified as the co-defendant Taylor, approached him from the driveway alongside the house. He stated (Jackson) had a gun pointed at his chest and was about 12' to 15' away from him; he told him to drop everything he had.

> Hampton said Taylor also had a gun in his hoodie pocket and he kept his hand on it. Hampton dropped $300.00 cash from his wallet, the wallet and his cell phone as directed onto the top of a bucket sitting on the driveway. (Jackson) asked if anybody was in the house and ordered Hampton to get whoever was inside to come out. Hampton at first said no one was in the house but (Jackson) cocked the gun which scared Hampton who testified he then became certain that the gun was real. Hampton directed his cousin Williams to come out; Williams came out and dropped $30.00 and his cell phone on the ground. Hampton testified (Taylor) came around to pick up the money and things and dropped his gun on the ground.

> Hampton testified both assailants had little masks which covered their mouths to below their noses. He stated (Jackson)'s hair was pulled back and Taylor's was short, in a cut style. They were ordered to go into the backyard as the men ran away. The residence was the second house on Mansfield off Vassar drive. Hampton testified he got a view of the two assailants and a third one who he noticed had been down the driveway as the men ran away. He testified he could look across the backyard of the corner house and see the three men running down Vassar, (they) having turned left off Mansfield, and he started chasing them. He testified (Jackson's) hoodie blew down and he saw (Jackson's) hair while he and his cousin were still in the backyard; he described Jackson's hair as being in a medium afro.

> Hampton ran after them down Vassar and testified he saw the men turn right at the first cross street which was St. Mary's. He testified he saw the third man, whom he described as more light complected entering a home on St. Mary's about

6 or 7 houses off Vassar. He ran up to the house; the address was 19441 St. Mary's. Within seconds, he stated, a guy and girl came out of the house but they were not the persons who robbed him. Mr. Hampton ran back to the corner at Vassar and the police arrived within a short time. The police went into the house and brought out four young black males whom he estimated as (all) between 17 to 25 years of age.

Hampton pointed out both defendants to the police as the young men were brought out. He stated they were no longer wearing hoodies or long pants but shorts and t shirts. He described Jackson's hair as: "pulled back with like a little rubber band in a pony tail." He also told the police the assailant's eyes were slanted and he was positive Jackson was the person. People's exhibit 4, the photograph of Mr. Jackson at his arrest was admitted. Hampton stated that $300.00, his wallet and his cell phone were recovered; they were returned to him at the police station.

On cross examination counsel for Mr. Jackson tried to impeach Hampton who described the main assailant's eyes as "beady" not slanted. Hampton responded those two descriptions are about the same. He also described the chief or first perpetrator to the police as between 16 and 19 whereas during the trial he testified the first assailant as between 17 and 25. He also estimated (Jackson's) weight as 135 to 150 pounds. Counsel also attempted to impeach Hampton with his preliminary examination testimony when he testified, when speaking to the people (one or two young men and a young woman) who had come out of the house just as he ran up to it, accusing them, saying: "Ya'll robbed me." Hampton responded that he had said to the man and woman leaving that the people in the house robbed him, not them.

Andrew Williams [testified] he had been inside the house putting shims onto the side door frame; the testimony was that the door was closed. He stated he opened the door and closed it when he saw a young kid outside but then opened it and came outside when his cousin asked him to please come outside before he was shot. He testified he was 6' to 8' from the first perpetrator when he came out and that the assailant had a head full of thick hair and slanted eyes. Williams identified defendant Jackson from his hair and eyes and described his hair was wild looking. He noted a second person who picked up the money and property he and his cousin had put down and testified hearing something drop from the second person.

Mr. Williams noted the second person, whom he identified as codefendant Taylor, had a wide nose and round eyes. He noticed the wild looking hair as the men ran away, noting the hair was pushed to the back. Mr. Williams also noted a third person as he ran who had braids. His cousin, Mr. Hampton ran after the assailants as he relieved himself in the backyard. A neighbor called the police. He went over to St. Mary street as his cousin walked back to the corner and said: "That's the house." The police arrived very quickly and went to the Mansfield house. Hampton took them over to St. Mary's and after three more scout cars arrived the police went inside the home.

Four guys were brought out; Mr. Williams testified he identified defendant Jackson as the individual with wild hair that he observed; he felt Jackson's appearance was distinct. He also identified Mr. Taylor from his nose and round eyes even though the four men were wearing shorts and did not have hoodies on. He had

no doubt, he said, of his identification.  He also believed the third subject wearing braided hair, was also there.  Williams also testified his property and money were returned to him at the station house.

On cross examination by Mr. Taylor, counsel impeached Mr. Williams' identification of his client indicating Williams would have been focused on the gun (Jackson) was holding on him.  Counsel also asked about the lighting claiming the lighting from the hallway and the drop light by the side door did not provide much light.  In cross examination by Mr. Jackson's attorney Williams admitted that in the statement he gave that evening he estimated the ages of the perpetrators as 15 to 21 years.  Williams admitted that in his statement he had said the perpetrator he identified as Jackson took his mask off when he ran, so that his hair was viewable.  But at trial, Williams stated (Jackson's) hoodie blew back revealing his hair.  On redirect examination Williams was asked whether he had written about the perpetrator's wild hair in his statement and Williams stated he had.

Lemuel Sims of the Detroit P.D. was partnered with Ronald Daniels.  He answered a radio run to Mansfield street and observed the two complainants on the corner they were directed to 19441 St. Mary's street where they stood by until back up arrived.  Sims walked around to the side of the house while officer Arsenault knocked on the door.  Sims testified Viola McKee opened the front door and gave them permission to enter.  The officers were looking for three perpetrators and eventually went into the basement of the home.  Three persons were brought out of the basement; defendant Jackson had bushy hair and defendant Taylor was found hiding under a bed in the basement.  Mr. Hampton's credit card was found in DaJuan Taylor's hoodie pocket.

The officer observed money scattered about the basement along with other credit cards with Hampton's name on them.  Sims testified his partner, Daniels, recovered a handgun in the closet although neither a mask nor a second gun was ever discovered. . . .  On cross examination Officer Sims testified DaJuan Taylor had a hoodie on when he was taken outside from the St. Mary's home and arrested.  He stated a total of four young black men were removed from the home that evening.  The officer testified a credit card belonging to Mr. Hampton was found in the pocket of the hoodie Mr. Taylor was wearing when he was arrested outside of St. Mary's.  He also testified Mr. Jackson was wearing dark pants when arrested at the St. Mary's house.

Officer Sims' partner Ronald Daniels testified he and Sims were back up to officers Arsenault and Harnphanich but they were first on the scene.  Daniels went to the side of the house and saw three black males in the basement near a bed, through a basement window.  He identified defendant Jackson by his afro hairstyle who had been standing by the bed.  Daniels said that his partner found defendant Taylor hiding under the bed.  He saw money by the head of the bed.  He also testified that he recovered a .22 caliber Reuger handgun in the closet by the bed.  People's exhibit 7, a semi automatic gun with a long barrel was admitted into evidence.  Officer Daniels admitted that no evidence of contraband was on Mr. Jackson when he was arrested.

6

. . . . Officer Rachel Arsenault was called by defendant Taylor. Her police report stated that Mr. Hampton chased the man with the gun to the St. Mary's home and the three men went in opposite directions. On cross examination by the prosecutor the officer stated Mr. Hampton never said the three ran in opposite directions. Rather, she interpreted that from what he said. She recalled that when the men were brought outside of the St. Mary's home Mr. Hampton tried to fight with Mr. Jackson and then with Mr. Taylor.

Officer Arsenault observed Officer Sims recover a credit card from Taylor when he was searched. In response to the Court's question, the officer stated that Hampton identified Mr. Jackson as the one with the gun when he was brought out of the house. There was a stipulation that Mr. Jackson's date of birth is June 26, 1984. Both Mr. Jackson and Mr. Taylor waived the right to testify in their own defense and both rested.

Def.-Appellant's Br. on Appeal, in *People v. Jackson*, No. 298420 (Mich. Ct. App.), at 7-14

(footnotes and citations to trial transcript omitted).

C.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility

8

for fairminded disagreement." *Id*. at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412). The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v.*

*Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Sufficiency of the Evidence (Claim I)*

Petitioner first contends that the prosecution presented insufficient evidence to prove his guilt beyond a reasonable doubt.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  "[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial."  *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011) (per curiam).  The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319).  Likewise, a reviewing court "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199

10

F.3d 329, 344 (6th Cir. 2000); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326. As the Court has explained, "the only question under *Jackson* is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065.[2] Under the amended version of § 2254(d)(1) a federal habeas court's review is "twice-deferential." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam). A state court's decision that the evidence satisfied the deferential *Jackson* standard is itself "entitled to considerable deference under AEDPA." *Coleman*, 132 S. Ct. at 2065; *see also*, *Cavazos*, 132 S. Ct. at 4.

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 132 S. Ct. at 2064 (citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16).

---

[2]Although *Jackson* and *Coleman* involved sufficiency of the evidence reviews of jury verdicts, the same standard is applied to verdicts rendered in bench trials. *See United States v. Bronzino*, 598 F.3d 276, 278 (6th Cir. 2010).

11

2.    *Analysis*

Petitioner does not challenge the sufficiency of the evidence with respect to any of the particular elements of the crimes for which he was convicted. Rather, petitioner contends that the evidence was insufficient to establish his identity as the shooter. The Michigan Court of Appeals rejected this claim, reasoning:

> In this case, both complainants had an opportunity to observe their assailant, and they both positively and unequivocally identified defendant as the armed robber. Hampton testified that as he was outside installing a side door at a home, defendant and a second man approached him and defendant demanded his belongings while pointing a gun at him. He observed that defendant was wearing a thin "short little mask" below his nose and a hooded sweatshirt, which left his eyes, nose, and hairline clearly exposed. Hampton relinquished his wallet, $300, and his cell phone, as directed. Williams was subsequently called outside and also emptied his pockets at defendant's direction. As defendant fled the scene on foot, defendant's hood came off, giving the complainants an opportunity to fully see defendant's hair. As Hampton pursued the men, intending to regain his identification, he observed the last of the men run into a particular house. The police were summoned and arrived within minutes, Hampton pointed out the house, and the police escorted four men from that house. Both Hampton and Williams immediately identified defendant as the person who pointed a gun and robbed them.
>
> Both complainants testified that they had no problems seeing their assailant during the criminal episode. The robbery occurred as it was getting dark, but it was not yet fully dark. Hampton testified that the area was "lit up." According to both complainants, the area was illuminated by lights on the side and front of the home, as well as a large, florescent drop light that provided lighting through the opened side door. Hampton testified that he had an opportunity to observe defendant for 15 or 20 minutes, and from a distance of approximately 12 to 15 feet; Williams had an opportunity to observe defendant from about six to eight feet. While defendant wore a small mask and a hood, defendant's nose, eyes, and hairline were exposed. Both Williams and Hampton observed that defendant had distinctive "slanted" eyes, and thick hair that was pushed back underneath his hood. After defendant's hood came off, Hampton observed that defendant had a "medium afro," while Williams described defendant as having "wild looking hair." When defendant was subsequently brought out of the house, he was easily recognizable to the complainants because of his distinctive eyes and hairstyle. Hampton and Williams both testified that they had no doubt that defendant was the person who robbed them at gunpoint. In addition, Hampton's cash, credit cards, and cell phone were found in the basement of the house in close proximity to defendant.
>
> Viewed in a light most favorable to the prosecution, the evidence was

12

sufficient to permit a rational trier of fact to reasonably infer that defendant was the person who robbed the complainants at gunpoint. Although defendant provides reasons why the trial court should not have accepted the complainants' identification, it was up to the trial court, as the trier of fact, to evaluate the evidence and, for purposes of resolving defendant's sufficiency challenge, this Court is required to view the evidence in a light most favorable to the prosecution. There was sufficient evidence of defendant's identification to support his convictions for armed robbery.

*Jackson*, 2011 WL 3209205, at *1-*2 (citation omitted).  The Court should conclude that this determination was reasonable.

It is well established that the testimony of a victim alone, if it establishes all the elements of the offense, is sufficient to support a guilty verdict.  *See O'Hara v. Brigano*, 499 F. 3d 492, 500 (6th Cir. 2007) (victim's testimony alone sufficient even though not corroborated by other witnesses or physical evidence); *United States v. Kenyon*, 397 F.3d 1071, 1076 (8th Cir. 2005) ("Even in the face of inconsistent evidence, a victim's testimony alone can be sufficient to support a guilty verdict."). A reviewing court may reverse a jury's credibility determinations only where the testimony is incredible as a matter of law, "such as where it was physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all."  *United States v. Radziszewski*, 474 F.3d 480, 485 (7th Cir. 2007) (internal quotation omitted); *accord United States v. Smith*, 606 F.3d 1270, 1281 (10th Cir. 2010); *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009); *United States v. Gadison*, 8 F.3d 186, 190 (5th Cir. 1993).  Here, the victims' testimony was not impossible based on their ability to observe or the laws of nature.  Both testified that they had sufficient light by which to see the men who committed the robbery.  Further, their testimony was buttressed by the fact that Hampton followed the robbers to the home in which petitioner and his codefendant were found, and that the victims' property was found in the home.

Petitioner nevertheless argues that the court of appeals's decision was unreasonable because it focused on the credibility of the victims, rather than on the reliability of their identification testimony. This argument is without merit. In the first place, petitioner's argument going to the reliability of the victims' identification testimony does not bear on the sufficiency of the evidence inquiry except as it relates to the credibility of the witnesses. While the erroneous admission of identification testimony may, or may not, entitle a habeas petitioner or appellant to relief on that basis, in assessing the sufficiency of the evidence the Court is required to weigh all of the evidence, even that evidence which was improperly admitted. *See United States v. Carneglia*, 47 Fed. Appx. 27, 34-35 (2d Cir. 2002); *United States v. Castaneda*, 16 F.3d 1504, 1510 (9th Cir. 1994); *cf. Lockhart v. Nelson*, 488 U.S. 33, 38-39 (1988) (in assessing whether the evidence was sufficient for purposes of determining whether retrial is permitted under the Double Jeopardy Clause, court looks at all of the evidence admitted, even that which was improperly admitted). Thus, even if the victims' identification testimony were erroneously admitted, this would provide no grounds for finding that the evidence was insufficient under *Jackson*. In any event, petitioner cannot show that the victims' identification testimony was unreliable and thus improperly admitted.

In *Perry v. New Hampshire*, 132 S. Ct. 716 (2012), the Court recently explained that the dangers of identification testimony are ordinarily to be combated by the safeguards inherent in the criminal justice system, including the rights of counsel, compulsory process and confrontation, and that reliability is determined by the finder of fact. A pretrial determination of reliability by the court is required only where the identification results from impermissibly suggestive pretrial procedures *arranged by the police*. *See id.* at 721 & n.1, 724-28, 730. Specifically, the Court held:

> When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose,

14

> notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Id*. at 721. Here, petitioner does not allege that there was any "improper law enforcement activity . . . . involved" in the victims' identifications of petitioner. Petitioner's argument essentially boils down to the contention that identification testimony is inherently unreliable, and thus cannot constitute sufficient evidence to support a conviction. The Supreme Court has rejected this view. *See Perry*, 132 S. Ct. at 728-29; *Foster v. California*, 394 U.S. 440, 442 n. 2 (1969) ("The reliability of properly admitted eyewitness identification . . . is a matter for the jury.").

In short, as the Supreme Court explained the *Jackson* standard does not permit "fine-grained factual parsing" of the evidence by a reviewing court, *Coleman*, 132 S. Ct. at 2064, nor does it permit this Court to reweigh the conflicts in the evidence or assess the credibility of the witnesses. The trier of fact was free to draw any reasonable inferences from the evidence, and to resolve the conflicts in the evidence in favor of the prosecution. In light of the victims' testimony it cannot be said that the trial judge's verdict based on the circumstantial evidence was "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. It follows that the Michigan Court of Appeals's rejection of this claim was reasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.    *Ineffective Assistance of Counsel (Claim II)*

Petitioner next contends that his trial counsel rendered constitutionally ineffective assistance at trial. The Court should conclude that petitioner is not entitled to habeas relief on this claim.[3]

---

[3]Respondent contends that portions of this claim, as well as portions of petitioner's third claim, are unexhausted. While procedural issues in a habeas case should ordinarily be resolved first, exhaustion is not jurisdictional, and "judicial economy sometimes dictates reaching the merits of [a claim or claims]

1.   *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*  With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.  With respect to the

---

if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); *see also*, *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Walter v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995); *cf. Granberry v. Greer*, 481 U.S. 129, 135 (1987) (court may dismiss unexhausted petition on the merits if that course serves judicial economy); 28 U.S.C. § 2254(b)(2) (authorizing court to dismiss unexhausted claims on the merits).  Because it is clear that these claims are without merit, the Court may deny them on this basis without resolving respondent's exhaustion argument.

prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not

whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

    2.    *Analysis*

Petitioner contends that counsel was ineffective for failing to properly impeach and cross-examine the witnesses, move to suppress the victims' identifications, make various objections, and request appointment of an investigator. The Court should conclude that these claims are without merit.

### a.  Cross-Examination

The Michigan Court of Appeals rejected petitioner's claim that counsel was ineffective for failing to properly cross-examine the witnesses, reasoning:

> The record discloses that, throughout the trial, trial counsel consistently and vigorously argued the primary defense theory of misidentification. Defendant acknowledges trial counsel's questions, but asserts that counsel should have further "strenuously questioned the complainants about their respective locations, vantage points, and overall ability to observe without adequate lighting. In making this claim, defendant ignores that codefendant's counsel cross-examined the witnesses first, and that the trial court specifically directed trial counsel not to "recreate the wheel" by covering the same matters that were covered by codefendant's counsel. Counsel specifically highlighted problems with the complainants' identification of defendant as one of the robbers, and elicited testimony intended to undermine the reliability of the identification testimony. In closing argument, trial counsel summarized the testimony and again argued that defendant's identification as one of the robbers was not established beyond a reasonable doubt. The record does not establish that trial counsel's performance fell below an objective standard of reasonableness.

*Jackson*, 2011 WL 3209205, at *3. The Court should conclude that this determination was reasonable.

"[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich.

18

2002) (Friedman, J.); *see Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001); *Dows v. Wood*, 211 F.3d 480, 489 (9th Cir. 2000). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Dell*, 194 F. Supp. 2d at 1219; *accord Millender v. Adams*, 187 F. Supp. 2d 852, 872 (E.D. Mich. 2002) (Rosen, J.). The mere fact that other avenues of impeachment may have existed does not render counsel ineffective; counsel need not "develop every bit of testimony through all available inconsistent statements." *Poyner v. Iowa*, 990 F.2d 435, 438 (8th Cir. 1993); *see also*, *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (internal quotation omitted) (counsel not ineffective even though "other testimony might have been elicited from those who testified."); *United States v. Kozinski*, 16 F.3d 795, 817 (7th Cir. 1994) (counsel not ineffective where counsel could have elicited additional impeachment information on cross-examination). Here, as the court of appeals observed, the victims were extensively cross-examined by both petitioner's counsel and codefendant's counsel regarding their identification of the robbers. Although petitioner contends that counsel should have been more vigorous, he does not identify any specific questions counsel should have asked or point to any additional evidence that could have been elicited by further cross-examination. In light of the great deference given to counsel's judgment in matters of cross-examination and impeachment, petitioner has failed to show that counsel was deficient or that he was prejudiced by counsel's performance, much less that the court of appeals's conclusion that he failed to make this showing was unreasonable as required by § 2254(d)(1).

### b. Suppression of Identification

Petitioner also contends that counsel was ineffective for failing to seek suppression of the

19

victims' identifications of him.  The court of appeals rejected this claim, explaining that petitioner had failed to show any basis for suppressing the identifications, and thus counsel could not be deemed ineffective.  *See Jackson*, 2011 WL 3209205, at *3.  This determination was reasonable. As explained above, under *Perry* in the absence of suggestive pre-trial lineup procedures arranged by the police, an identification is admissible and questions relating to its reliability are for the finder of fact to determine in weighing the evidence.  "Generally if identification procedures prior to trial were not unduly suggestive, questions as to the reliability of a proposed in-court identification affect only the identification's weight, not its admissibility." *United States v. Matthews*, 20 F.3d 538, 547 (2d Cir. 1994); *see also*, *Perry*, 132 S. Ct. at 721 & n.1, 724-28, 730; *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001).  Petitioner does not suggest that the victims' identifications were tainted by any impermissibly suggestive pretrial procedures.  In the absence of any such procedures, petitioner cannot show that the victims' identifications were inadmissible, and thus any objection by counsel would have been futile.  Counsel cannot be deemed ineffective for failing to raise a meritless objection.  *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c.  Failure to Object and Request Investigator

Petitioner also contends that counsel was ineffective for failing to raise various objections, and for failing to request an investigator.  Petitioner does not explain to what in particular counsel should have objected.  He does not identify any inadmissible evidence or improper prosecutorial argument that he claims was objectionable.  Petitioner's general argument that counsel failed to lodge unspecified objections is insufficient to meet his burden of showing that counsel was

ineffective.  With respect to the investigator, the court of appeals rejected petitioner's claim, reasoning that petitioner failed to "specify what helpful or valuable information needed to be obtained by an investigator."  *Jackson*, 2011 WL 3209205, at *4.  This determination was reasonable.  As noted above, "it is petitioner's burden to establish the elements of his ineffective assistance of counsel claim." *Pierce*, 63 F.3d at 833.  Thus, "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).  Here, petitioner has failed to suggest any evidence that an investigator could have uncovered that would have supported his defense.  In the absence of any such suggestion, petitioner cannot show that counsel was ineffective for failing to request the appointment of an investigator.  Accordingly, petitioner is not entitled to habeas relief on this claim.

F.    *Limitation on Cross Examination (Claim II)*

Although petitioner's second claim is phrased solely as an ineffective assistance of counsel claim, petitioner's argument also suggests an argument that the trial court impermissibly limited the scope of counsel's cross-examination of the witnesses, violating his Sixth Amendment right to confront the witnesses.  To the extent petitioner is attempting to assert such a claim, the Court should conclude the claim is without merit.

1.    *Clearly Established Law*

The Supreme Court's "Confrontation Clause cases fall into two broad categories:  cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination."  *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (per curiam).  The latter category, which is implicated here, recognizes that "[c]onfrontation

21

means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Thus, in cases where the trial court has restricted cross-examination in some manner, "the Court has recognized that Confrontation Clause questions will arise because such restrictions may 'effectively . . . emasculate the right of cross-examination itself.'" *Fensterer*, 474 U.S. at 19 (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

However, the Supreme Court has also explained that the Confrontation Clause does not "guarantee cross-examination that is effective in whatever way and to whatever extent the defense might wish." *Fensterer*, 474 U.S. at 20. The question is whether the trial court's ruling allowed for "substantial compliance with the purposes behind the confrontation requirement," or, put another way, whether petitioner was "significantly limited in any way in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166. Thus, "[s]o long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998); *see also*, *United States v. Larranaga*, 787 F.2d 489, 498 (10th Cir. 1986). Further, even if a restriction on cross-examination amounts to a violation of the confrontation right, such an error may be harmless. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

2.    *Analysis*

Here, the record does not disclose that counsel was in any way "significantly limited in any way in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166. Prior to the start of counsel's cross-examination of the first witness, which occurred after codefendant's counsel had already cross-examined the witness, the trial judge stated to counsel: "And remembering that you have a Judge, not a jury, let's not recreate the wheel." Waiver Trial Tr., dated 4/21/10, at 78. This

22

comment by the trial judge did not in any way limit counsel's cross-examination.  The court merely requested that counsel not recover matters already covered by codefendant's counsel.  At no point did the court limit counsel's examination of the witnesses regarding any matters relevant to petitioner.  Petitioner does not point to any specific questions that counsel was prohibited from asking.  In short, petitioner has failed to show that the trial court's brief admonishment to counsel to not "recreate the wheel" in any way prevented counsel from asking any questions of the witnesses.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Sentencing (Claim III)*

Petitioner next raises several challenges to his sentencing.  The Court should conclude that these claims are without merit.

1.      *Guidelines Scoring*

Petitioner first contends that the trial court erred in scoring the Michigan sentencing guidelines.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.  A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987).  Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).  Petitioner's claim that the court improperly scored or departed from the guidelines range raises issues of state law that are not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999)

(Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review). Thus, petitioner is not entitled to habeas relief on his claims relating to the trial court's scoring of, or departure from, the Michigan sentencing guidelines.

2. *Judicial Factfinding*

Petitioner next contends that his sentence was illegal because it was based on facts found by the trial judge at sentencing which were not proven beyond a reasonable doubt at trial, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Blakely*, the Court considered the applicability of *Apprendi* to a state sentencing guidelines scheme similar to the United States Sentencing Guidelines. The state in that case argued that guidelines findings were not prohibited by *Apprendi* because *Apprendi* prohibited only factual findings at sentencing which increased the statutory maximum penalty to which the defendant was exposed. The Court in *Blakely* rejected this argument and struck down the state guidelines scheme, explaining that:

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (citations omitted) (emphasis in original). Finally, in *United States v. Booker*, 543 U.S. 220 (2005), the Court took the step logically suggested by *Blakely*, concluding that the United States Sentencing Guidelines are unconstitutional under *Apprendi* because they allow federal judges to impose sentences based on facts not found by a jury beyond a reasonable doubt. *See Booker*, 543 U.S. at 233, 237-43.

*Blakely* and *Apprendi*, however, are inapplicable here. Michigan law provides for an indeterminate sentencing scheme, unlike the determinate sentencing schemes at issue in *Blakely* and *Booker*. Under Michigan law the defendant is given a sentence with a minimum and a maximum sentence. The maximum sentence is not determined by the trial judge but is set by law. *See People v. Drohan,* 475 Mich. 140, 160-61, 715 N.W.2d 778, 789-90 (2006); *People v. Claypool,* 470 Mich. 715, 730 n.14, 684 N.W.2d 278, 286 n.14 (2004); Mich. Comp. Laws § 769.8. "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum sentence." *Drohan,* 475 Mich. at 161, 715 N.W.2d at 790. Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range. *See People v. Babcock,* 469 Mich. 247, 255 n.7, 666 N.W.2d 231, 236 n.7 (2003) (discussing Mich. Comp. Laws § 769.34(2)). Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *See Claypool,* 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

*Blakely* is inapplicable here because *Blakely* is concerned only with the *maximum* penalty which is authorized by a jury's findings or a defendant's plea: if some additional factor increases the defendant's penalty beyond that which could be imposed solely on the basis of the jury's findings or the defendant's plea, *Blakely* requires that those facts be found by a jury beyond a

25

reasonable doubt (or be themselves pleaded to by a defendant). As explained above, unlike the guidelines scheme at issue in *Blakely*, the Michigan sentence guidelines help determine only the minimum portion of a defendant's indeterminate sentence. The maximum is, in every case, the statutory maximum authorized by law. *See Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14; MICH. COMP. LAWS § 769.8. Petitioner's conviction on the armed robbery charge, therefore, contained all of the factual findings necessary to impose the statutory maximum (life imprisonment) on that charge. *See Drohan*, 475 Mich. at 162, 715 N.W.2d at 790 ("Thus, the trial court's power to impose a sentence is always derived from the jury's verdict, because the 'maximum-minimum' sentence will always fall within the range authorized by the jury's verdict.").

This being the case, petitioner's sentence did not violate *Blakely*. The Supreme Court has repeatedly made clear that the *Apprendi* rule is concerned only with the maximum sentence which is authorized by a jury's verdict or a defendant's plea. As the Supreme Court explained in *Harris v. United States*, 536 U.S. 545 (2002):

> *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime–and thus the domain of the jury–by those who framed the Bill of Rights. The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict authorized the judge to impose the minimum with or without the finding.

*Harris*, 536 U.S. at 557. This distinction is important because the only issue under the Sixth Amendment is whether the judge is impinging on the role of the jury. For this reason, the Court explicitly excepted indeterminate sentencing schemes such as Michigan's from its holding in *Blakely*. Rejecting an argument raised by Justice O'Connor in dissent, the Court explained:

> Justice O'Connor argues that, because determinate sentencing schemes involving judicial factfinding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former.

26

This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence–and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Blakely*, 542 U.S. at 309 (citation omitted). Under this reasoning, it is clear that Michigan's indeterminate sentencing guideline scheme, under which the maximum is established by statute and only the minimum term is based on judicial factfinding, does not violate the Sixth Amendment, as both the Sixth Circuit and the Michigan Supreme Court have repeatedly held. *See Montes v. Trombley*, 599 F.3d 490, 496-97 (6th Cir. 2010); *Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009); *Drohan,* 475 Mich. at 164, 715 N.W.2d at 791-92; *Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

This conclusion is not altered by the Supreme Court's more recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013). In that case, the Court overruled *Harris*, and extended *Apprendi* to facts that increase a mandatory minimum sentence. Reasoning that the *Harris* Court's distinction between facts that increase the statutory maximum and facts that increase a mandatory minimum is inconsistent with *Apprendi*, the Court in *Alleyne* held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne*, 133 S. Ct. at 2155 (citation omitted). The Court was careful to note, however,

27

that its ruling "does not mean that any fact that influences judicial discretion must be found by a jury." *Id*. at 2163. Judges retain broad discretion to impose any sentence within the range authorized by law based on the jury's findings (or the facts admitted in a plea), and may judicially find facts in exercising this discretion. *See id*.

*Alleyne* is inapplicable here. *Alleyne* dealt with statutory mandatory minimum sentences, as opposed to facts used to determine the minimum sentence of an indeterminate sentencing scheme such as Michigan's. Therefore, "[i]t is questionable whether *Alleyne* applies to Michigan's sentencing scheme." *Spears v. Curtin*, No. 1:13-cv-1013, 2013 WL 5636625, at *6 (W.D. Mich. Oct. 16, 2013). More importantly, even if *Alleyne* now bars judicial factfinding under the Michigan sentencing scheme, it does not constitute "clearly established federal law" under § 2254(d)(1) for purposes of petitioner's claim. At the time the Michigan Court of Appeals rejected petitioner's *Apprendi* claim, *Alleyne* had not been decided and the Court's decision in *Harris* made clear that the Michigan Court of Appeals's rejection of petitioner's claim was proper. The rule of *Alleyne* was not clearly established at the time the state courts rejected petitioner's claim, and thus it provides no basis for habeas relief under § 2254(d)(1). *See Kittka v. Franks*, 539 Fed. Appx. 668, 672 (6th Cir. 2013); *Williams v. Smith*, No. 11-15163, 2014 WL 632437, at *7 (E.D. Mich. Feb. 18, 2014) (Lawson, J., adopting report and recommendation of Komives, M.J.); *Stockman v. Berghuis*, No. 2:10-CV-14860, 2013 WL 6885121, at *14 (E.D. Mich. Dec. 31, 2013). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 3. *Proportionality*

Finally, petitioner argues that his sentence is disproportionate to his offense. To the extent that petitioner relies on the Michigan proportionality rule established in *People v. Milbourn*, 435

28

Mich. 630, 461 N.W.2d 1 (1990), his claim is solely one of state law which is not cognizable on federal habeas review. *See Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.). To the extent petitioner claims that his sentence violates the Eighth Amendment, the claim is without merit.

In *Solem v. Helm*, 463 U.S. 277 (1983), the Supreme Court held that the Eighth Amendment requires that "a criminal sentence be proportionate to the crime for which the defendant has been convicted." *Id.* at 290. In considering whether a sentence is proportionate, the Court identified three objective factors which are relevant: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for the same crime in other jurisdictions." *Id*. at 292. Applying this test to the facts before it, the Court found that the defendant's sentence of life imprisonment without possibility of parole under a habitual offender statute was disproportionate where the three underlying felonies were nonviolent crimes involving small sums of money, the final felony being for uttering a false check. *See id.* at 303. However, the reach of *Solem* has been limited by the Supreme Court's more recent decisions. In *Harmelin v. Michigan*, 501 U.S. 957 (1991), the Court held that Michigan's mandatory sentence of life imprisonment for possession of over 650 grams of a controlled substance did not violate the Eighth Amendment. Justice Scalia, joined by Chief Justice Rehnquist, reasoned that *Solem* was wrongly decided and should be overruled, and concluded that the Eighth Amendment contains no proportionality requirement outside the capital punishment context. *See Harmelin*, 501 U.S. at 965 (Scalia, J.). Justice Kennedy, joined by Justices O'Connor and Souter, concluded that the Eighth Amendment contains a very narrow proportionality principle, which prohibits only those punishments which are 'grossly' disproportionate to the crime. *See id*. at 1001 (Kennedy, J.)

29

Further, Justice Kennedy's opinion distinguished *Solem*, essentially limiting application of the *Solem* objective criteria test to the facts in that case. *See id.* at 1001-05. Specifically, Justice Kennedy concluded that the objective analysis required in *Solem* is "appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* at 1005-06.[4] Thus, it is unclear whether, and to what extent, *Solem* remains good law. *See McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992) ("By applying a head-count analysis, we find that seven members of the Court supported a continued Eighth Amendment guaranty against disproportional sentences. Only four justices, however, supported the continued application of all three factors in *Solem*, and five justices rejected it. Thus, this much is clear: disproportionality survives; *Solem* does not.").

As the Sixth Circuit has summarized, under *Harmelin*, "although only two Justices [Rehnquist and Scalia] would have held that the eighth amendment has no proportionality requirement, five Justices [Kennedy, O'Connor, and Souter, along with Rehnquist and Scalia] agree that there is no requirement of strict proportionality." *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991). At most, then, the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001; *Hopper*, 941 F.2d at 422 ("the eighth amendment is offended only by an extreme disparity between crime and sentence"). Thus, as a general matter, "one could argue without fear of contradiction by any decision of the [Supreme] Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of sentence actually imposed

---

[4] Justices White, Blackmun, Stevens, and Marshall all concluded that *Solem* should be upheld, and the three factor test applied to the sentencing scheme at issue. *See Harmelin*, 501 U.S. at 1016 (White, J., dissenting).

is purely a matter of legislative prerogative." *Rummel v. Estelle*, 445 U.S. 263, 274 (1980); *see Harmelin*, 501 U.S. at 962-65 (Scalia, J.); *id.* at 997-1001 (Kennedy, J.)

More recently, the Supreme Court again considered the proportionality issue under the Eighth Amendment, resulting in a split similar to that reached in *Harmelin*. In *Ewing v. California*, 538 U.S. 11 (2003), a three-justice plurality reaffirmed Justice Kennedy's approach in *Harmelin*, concluding that the Eighth Amendment contains a narrow proportionality principle which forbids sentences which are grossly disproportionate to the offense. *See id.* at 23-24 (opinion of O'Connor, J.) Justice O'Connor was joined in this position by Justice Kennedy, who had authored the plurality opinion in *Harmelin*, and by Chief Justice Rehnquist, who in *Harmelin* had joined Justice Scalia in concluding that the Eighth Amendment contains no proportionality requirement outside of the capital sentencing context. Justice Scalia, now joined by Justice Thomas (who was not on the Court when *Harmelin* was decided), reaffirmed his view that the Eighth Amendment contains no proportionality guaranty. *See id.* at 32 (opinion of Scalia, J.); *id.* at 32 (opinion of Thomas, J.). Justice Stevens likewise reaffirmed his view from *Harmelin* that the three-factor test of *Solem* guides the proportionality inquiry under the Eighth Amendment. Justice Stevens was joined in this view by Justice Souter, who had joined the plurality opinion of Justice Kennedy in *Harmelin*, as well as by Justices Ginsburg and Breyer, who were not on the Court when *Harmelin* was decided. *See id.* at 33-35 (opinion of Stevens, J.); *id.* at 36-37 (opinion of Breyer, J.).  Thus, although the particular Justices attached to each position have changed somewhat, the numbers and rationales in *Ewing* break down precisely as they did in *Harmelin*. Thus, for purposes of habeas review, the Sixth Circuit's analysis of *Harmelin*, in which this Court asks only whether the sentence is grossly disproportionate to the offense, *see Coleman v. DeWitt*, 282 F.3d 908, 915 (6th Cir. 2002); *United*

31

*States v. Baker*, 197 F.3d 211, 217 (6th Cir. 1999), remains controlling under *Ewing*.

Here, the *Harmelin* plurality's "threshold comparison" of petitioner's crime and the sentence imposed, does not "lead to an inference of gross disproportionality," *Harmelin*, 501 U.S. at 1005, and thus the Court should conclude that petitioner is not entitled to habeas relief on this ground. Petitioner was sentenced to a term of 20-30 years' imprisonment for an armed robbery, a crime carrying a potential sentence of life imprisonment, *See* MICH. COMP. LAWS § 750.529, and which involved the perpetrators brandishing a gun at the victims.  In these circumstances, petitioner's sentence of 25-40 years' imprisonment is not grossly disproportionate to his offense. *See, e.g.*, *Little v. Butler*, 848 F.2d 73, 77 (5th Cir. 1988) (25 year sentence for attempted armed robbery not disproportionate); *United States v. Oglesby*, 764 F.2d 1273, 1279 (7th Cir. 1985) (20 year sentence for armed robbery); *Hanks v. Jackson*, 123 F. Supp. 2d 1061, 1075 (E.D. Mich. 2000) (Gadola, J.) (20-50 year sentence for armed robbery); *Atkins v. Overton*, 843 F. Supp. 258, 261-62 (E.D. Mich. 1994) (Gadola, J.) (10-30 year sentence for armed robbery).  In addition, petitioner was sentenced as an habitual offender, having had a number of prior convictions. *See Rummel*, 445 U.S. at 284-85 (mandatory sentence of life imprisonment under recidivist statute not disproportionate where defendant's three qualifying convictions were all nonviolent theft offenses involving a total of less than $230); *Williams v. Johnson*, 845 F.2d 906, 910 (11th Cir. 1988) (upholding life sentence as an habitual offender for forgery offense).    Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.     *Recommendation Regarding Certificate of Appealability*

1.     *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides

that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

33

Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

      2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability.  With respect to petitioner's sufficiency of the evidence claim, it is clear that the victims' testimony was sufficient to identify petitioner as one of the perpetrators, and that the weight and reliability of this testimony was for the trial court to determine as the finder of act.  Thus, the resolution of petitioner's sufficiency of the evidence claim is not reasonably debatable.  Because the record shows that counsel vigorously cross-examined the witnesses and presented petitioner's misidentification defense, and because there was no basis for seeking suppression of the identification testimony or the appointment of an investigator, the resolution of petitioner's ineffective assistance of counsel claims is not reasonably debatable.  Because the record shows that counsel was not in any way limited in his cross-examination of the witnesses, the resolution of petitioner's confrontation claim is not reasonably debatable.  Finally, because it is clear that petitioner's challenge to the scoring of the guidelines is not cognizable, that *Apprendi* does not (or at least did not at the time of the court

34

of appeals's decision) apply to Michigan's indeterminate sentencing scheme, and that petitioner's sentence was not grossly disproportionate to his offense, the resolution of petitioner's sentencing claims is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Date: March 31, 2014                          s/Paul J. Komives_____
                                              PAUL J. KOMIVES
                                              UNITED STATES MAGISTRATE JUDGE


<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 31, 2014.


                                              s/ Kay Doaks_____
                                              Case Manager